ETHEL M. BONN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 71835. Filed April 15, 1960.

*William E. Haney, Esq.*, for the petitioner.
*William J. McNamara, Esq.*, for the respondent.

FORRESTER, *Judge:* Respondent has determined a deficiency in petitioner's 1954 income tax in the amount of $415. The sole issue is whether the amount of $2,959.11 received by petitioner in 1954 from the Veterans' Administration is excludible from income under section 117 of the Internal Revenue Code of 1954.[1]

### FINDINGS OF FACT.

The stipulated facts are so found.

Petitioner is an individual residing in Topeka, Kansas. Her original and an amended income tax return for the calendar year 1954 were filed on the cash basis with the director of internal revenue for the district of Kansas.

In her original return petitioner reported the amount of $2,959.11 as wages received from the Veterans' Administration (hereinafter

---

[1] SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS.

   (a) GENERAL RULE.—In the case of an individual, gross income does not include—
   (1) any amount received—
      (A) as a scholarship at an educational institution (as defined in section 151(e)(4)), or
      (B) as a fellowship grant ***

called the VA) and claimed a credit for income tax withheld in the amount of $416.40. On her amended return she excluded the foregoing $2,959.11 as exempt from tax and claimed and received a refund in the amount of $415.

On July 19, 1951, a contract was entered into by the VA and the Menninger Foundation (hereinafter called the Foundation), whereby the Foundation agreed to furnish a course of instruction and training (hereinafter called the Program) at the Winter VA Hospital (hereinafter called the Hospital) at Topeka, Kansas. Such contract reads as follows:

WHEREAS, the Veterans Administration, in the execution of laws it is charged with administering, has determined the necessity of maintaining a course of instruction and training in psychiatry for Veterans Administration residents at the Veterans Administration Hospital at Topeka, Kansas, which the Veterans Administration with present personnel and facilities is not able to furnish, and

WHEREAS, The Menninger Foundation, a corporation, situated at Topeka, Kansas, is available to render professional services necessary for the operation and maintenance of such course of instruction and training in psychiatry to the extent specified in paragraphs 1 and 2 hereof, agreement is hereby entered into between the Veterans Administration and The Menninger Foundation, hereinafter referred to as the Contractor, as follows:

1. The Contractor agrees, subject to approval by the Veterans Administration, to plan and to provide general supervision of a course of instruction and training to be given residents in psychiatry at Veterans Administration Hospital, Topeka, Kansas. This includes lecture courses, seminars, section conferences, training in neuropathology and neurophysiology, and other appropriate instruction and training as required by the Veterans Administration for residents in psychiatry. The instruction and training planned and supervised by the Contractor must meet all the requirements to qualify Veterans Administration residents for acceptance to examination given by the American Board of Psychiatry and Neurology in addition to the requirements hereinafter required by the Veterans Administration. Schedule No. 1, attached hereto, is provided as a guide for the Contractor in preparing material for conducting the training required herein. The Manager, Veterans Administration Hospital, Topeka, Kansas, is authorized to make such deviations to Schedule No. 1, attached, as required by the Veterans Administration and to meet current or future requirements of the American Board of Psychiatry and Neurology or the Veterans Administration.

2. In addition to the services to be rendered as described in paragraph 1, hereinabove, the Contractor agrees to provide all necessary supervision of the course of instruction and training for residents in psychiatry at Veterans Administration Hospital, Topeka, Kansas. This not only includes supervision of the program of instruction and training, but also includes supervision of such supplementary instruction and training as may be furnished by the Veterans Administration from its own staff or otherwise, when such supplementary instruction or training is deemed necessary by the Veterans Administration. It is understood that any supplementary instruction and training as referred to in the foregoing will be so provided at the expense of the Veterans Administration, apart from and independently of the compensation hereinafter provided for the services of the Contractor under the terms of this agreement, provided that employees of the Contractor or designates thereof will be accorded permission for attendance at or participation in such supplementary instruction

or training, subject to such accommodations as may be available after the needs of Veterans Administration residents are first met in all respects and provided further that, reciprocally, Veterans Administration residents or designates are provided like accommodations at lectures, seminars, or other instruction or training afforded by the Contractor in relation to the administration of its own activities in addition to the services provided above.

3. In consideration of the services as provided in paragraphs 1 and 2 above, the Veterans Administration agrees to pay the Contractor the sum of $50,000 per year for such services when between 40 and 60 Veterans Administration residents, inclusive, are in training in psychiatry at Veterans Administration Hospital, Topeka, Kansas. The Veterans Administration further agrees to pay the Contractor an additional sum of $12,50 [sic] per year for each group of residents numbering from one to five, inclusive, in excess of 60 residents undergoing training in psychiatry at Veterans Administration Hospital, Topeka, Kansas. The sum for which the Contractor is entitled to reimbursement as described hereinabove will be reduced by $833 per year for each position for residents in psychiatry not filled below the number of 40.

4. The Veterans Administration agrees to furnish the Contractor space and facilities at the Veterans Administration Hospital, Topeka, Kansas, for the purposes of providing the services in paragraphs 1 and 2, above. Such space and facilities will be furnished only to the extent determined necessary by the Manager, Veterans Administration Hospital, Topeka, Kansas.

5. No separate charge will be made by the Contractor or any employee thereof, for the supervision of the care and treatment of veteran patients in the Veterans Administration Hospital, Topeka, Kansas, when such supervision of care and treatment is incident in whole or in part to the services for which reimbursement is provided in paragraph 3 above. This agreement does not preclude the Contractor or employees thereof from performing services on a temporary full-time, part-time or fee basis, subject to the provisions of existing laws, for the care and treatment of patients of the Veterans Administration Hospital, Topeka, Kansas, or elsewhere, Provided such services are wholly apart from and independent of the services outlined in paragraphs 1 and 2 above, and for which reimbursement is provided in paragraph 3 above, Provided further that the Contractor, or any employee thereof, will make no charge against the Veterans Administration for consultation, care, or treatment of any patient or any consultation service rendered on the same day that the person participates in the services performed by the Contractor under the provisions of paragraphs 1 and 2 above. This provision is expressly intended to eliminate any possibility of duplicate payment by the Veterans Administration for services rendered; however, if any such charge is made and erroneously paid by the Veterans Administration, it will be refunded by the Contractor.

6. It is recognized by the Veterans Administration that the curriculum of study, instruction, and training, as outlined in Schedule No. 1, attached, is subject to variation and change. Schedule No. 1, attached, is therefore a guide only for the use of the Contractor and the Manager, Veterans Administration Hospital, Topeka, Kansas. The Manager, Veterans Administration Hospital, Topeka, Kansas is charged with the responsibility of insuring that the services performed by the Contractor, as specified in paragraphs 1 and 2 above, meet the requirements of the Veterans Administration and that the training, instruction, and supervision, furnished by the Contractor, fully meet the requirements of the American Board of Psychiatry and Neurology at all times. Any changes to Schedule No. 1, attached, authorized or required by the Manager, Veterans Administration Hospital, Topeka, Kansas, will not affect the compensation to be paid the Contractor as specified in paragraph 3 above.

7. The Contractor agrees to submit in writing to the Veterans Administration during the period of the contract, at intervals specified by the Veterans Administration, reports of the progress of the residents receiving instruction and training under the terms of this agreement, furnishing such information as the Veterans Administration may require.

8. Duly authorized representatives of the Veterans Administration shall be permitted to visit the Contractor and to examine the training facilities and the work of the residents receiving instruction and training under this agreement. A copy of the schedule of studies to be followed by each resident shall be made available to the Veterans Administration.

9. [Manner of presentation and payment of invoices.]

10. Services by the Contractor under this agreement will be rendered at the Veterans Administration Hospital, Topeka, Kansas, or at The Menninger Foundation situated at Topeka, Kansas, or at such other place or places as may be designated or approved by the Veterans Administration.

11. The Contractor warrants that the tuition charges provided for herein are not in excess of those charged residents from sources other than the Veterans Administration. For the purposes of this paragraph it is understood that the tuition rate per resident per year is $833.

12.–16. [Formal provisions regarding nondiscrimination, effective dates, settlement of disputes, etc.]

The attached Schedule No. 1 reads as follows:

### SCHEDULE NO. 1

#### FOR FISCAL YEAR 1952 CONTRACT

a. Program for first-year residents

| Subject | Number of meetings | Hours |
|---|---|---|
| (1) Lectures and lecture courses | | |
|   (a) Orientation | | |
|     Psychiatric Case Study | 15 | 15 |
|   (b) General Psychopathology | 35 | 35 |
|   (c) Psychiatric Treatment Methods | 22 | 22 |
|   (d) Basic Neurology | 17 | 17 |
| (2) Seminars | | |
|   Basic Psychiatric Literature | 40 | 80 |

b. Program for second-year residents

| Subject | Number of meetings | Hours |
|---|---|---|
| (1) Lecture courses | | |
|   (a) Principles of psychotherapy (second course) | 25 | 25 |
|   (b) Clinical Neurology | 20 | 20 |
|   (c) Personology | 20 | 20 |
| (2) Seminars | | |
|   Practical Applications of Psychiatry to Social Situations | 8 | 16 |
| (3) Control Groups—Psychotherapy Techniques | | |
| 3 groups—each 40 meetings, 80 hours | | |
|   Total | 120 | 240 |
| (4) Neurological Laboratory Work | | |
|   (a) Neuroanatomy | 17 | 34 |
|   (b) Neuropathology | 17 | 34 |
|   (c) Psychosomatic Concepts of Automanic Physiology | 5 | 5 |

(5) And in addition complete supervision of residents assigned to The Menninger Clinic Adult Division for Hospital and/or Out Patient Services.

| Subject | Number of meetings | Hours |
|---|---|---|
| c. Program for third-year residents | | |
| (1) Lecture courses | | |
| (a) Principles of Psychotherapy (third course) | 20 | 30 |
| (b) Marriage and Family Counselling | 12 | 12 |
| (2) Seminars | | |
| (a) Principles of Dynamic Psychiatry | 70 | 140 |
| (3) Control Groups—Psychotherapy Techniques | | |
| 3 groups—each 40 meetings, 80 hours | | |
| Total | 120 | 240 |
| (4) Individual Control Sessions in the Application of Psychotherapy | | 250 |
| (5) And in addition complete supervision of residents assigned to The Menninger Clinic Adult Division for Hospital and/or Out Patient Services; also complete supervision of residents assigned to the Children's Division of the Menninger Clinic. | | |
| d. Miscellaneous teaching hours not restricted to any particular year of study | | 300 |

Residents under the Program accumulate annual and sick leave. Deductions are made from such leave or from pay for any periods of leave taken. Residents are paid solely by the VA, which withholds a portion of such payments as income tax withheld at source. The Hospital charges payments made to residents to the same account as salaries paid to staff physicians, but sometimes refers to the former class of payments as "stipends," rather than "salaries."

The VA has the ultimate authority under its contract with the Foundation to determine the nature of instruction and training to be given a resident placed under the Program. Such instruction and training must meet the requirements both of the VA and of the American Board of Psychiatry and Neurology (hereinafter called the Board). In addition to payments to the residents themselves, the VA pays the Foundation an amount for its part in the Program, designating the latter as "Training Funds."

Residents in psychiatry under the Program are sometimes referred to as fellows in the Menninger School of Psychiatry. Upon successful completion of the residency, each resident receives a certificate from the foregoing school attesting the completion of the course of instruction.

A resident receiving payments from the VA of the type here in issue may be assigned to one or more of several affiliated institutions for training unavailable at a VA hospital. The VA continues to pay the resident during such periods and retains responsibility for his training. Such affiliated training may not in any instance exceed one-third of the residency period, and is based upon the needs and requirements of the VA. Where it has been determined that a resident is to be assigned to an affiliated program, he must accept

such assignment or terminate his residency, in which case he receives no further payments from the VA.

The Hospital is a general service hospital, with no preference as to admission for chronically ill patients over those with mental disturbances of a more or less common nature. The only preference or priority patients are those with a service-connected disability, others being admitted in the order of application, as soon as facilities are available.

The principal purpose of the Hospital is the care and treatment of patients. There are 783 beds in the psychiatric section and 67 additional beds in the neurological section, normally with about 95 per cent occupancy. Approximately 14 staff physicians and 21 residents are attached to the psychiatric and neurological wards.

Residents are normally used in the treatment of patients. A resident in the psychiatric section will have a certain number of patients, perhaps 25, assigned to him. His typical workday is in part approximately as follows:

|  | Hours |
| --- | --- |
| Conference with other ward personnel | ½ |
| Check on activities of some of assigned patients | 1 to 1½ |
| Consultation with consultant or section chief | 1 to 2 |
| Individual treatment of patients | 1½ |
| Total | 4 to 5½ |

In addition, residents are required to supervise and train other personnel, such as nurses aides and psychological therapists, and to interview or process new admissions. The latter task requires 5 to 6 hours per patient if undertaken by an experienced full-time staff psychiatrist and somewhat more time when performed by a resident.

The normal workday of a resident is from 8 a.m. to 4:30 or 5:30 p.m., Monday through Saturday. Approximately 8 hours per week during this period are devoted to instruction courses given by the Foundation. The remaining workday time is spent chiefly in performing services for the Hospital, with some relatively minor portion devoted to instruction or educational courses offered by the Hospital itself.

Residents at the Hospital under the Program are not degree candidates. Their ultimate objective is to acquire proficiency as psychiatrists, usually with the hope of qualifying for certification by the Board, which requires 3 years of residency and 2 years of practical experience. They perform professional services for the Hospital in the course of their residencies and are under the supervision and control of the VA while so engaged.

In 1952 petitioner applied to the Foundation for a fellowship and to the VA for a residency in psychiatry. She was accepted under

the Program, and commenced her activity at the Hospital in July 1953. During 1954 she received from the VA the amount of $2,959.11.

Petitioner has been employed at the Hospital as a staff psychiatrist since January 1, 1956. In 1956 she received a certificate from the Foundation, and in 1957 she was certified by the Board.

Petitioner is presently in charge of the women's branch of the psychiatric section, which has approximately 120 patients. This branch has 2 staff psychiatrists, including petitioner, and 5 residents, each of whom performs essential professional services. Elimination of residents from the psychiatric section would require substantial changes in the method of operation at the Hospital.

#### OPINION.

Petitioner received $2,959.11 from the VA during 1954. The sole question is whether this amount constituted compensation for personal services, as determined by respondent, or a fellowship grant within the purview of section 117 of the Internal Revenue Code of 1954, as contended by petitioner.

Section 1.117–4 of respondent's Income Tax Regulations provides in part as follows:

Sec. 1.117–4 Items not Considered as Scholarships or Fellowship Grants.— The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117:

\*         \*         \*         \*         \*         \*         \*

(c) *Amounts paid as compensation for services or primarily for the benefit of the grantor.*

(1) Except as provided in § 1.117–2(a), any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.

Section 1.117–2(a) applies solely to candidates for a degree, and is concededly inapplicable here.

Petitioner does not contend that this regulation is an incorrect interpretation of the statute. We believe the regulation is sound. Accordingly, the sole question is whether the amount received by petitioner in fact represented compensation for services. Our review of the entire record here convinces us that this question must receive an affirmative answer.

Whatever petitioner's purpose in accepting a residency at the Hospital, it is apparent that she and the other residents there, all graduate physicians, performed valuable and essential professional services of a substantial nature, both in terms of time spent on duty and of the importance of the services to the Hospital.

To be sure, one of petitioner's witnesses testified in answer to a general question, that the residents do not replace personnel who would otherwise have to be hired. This conclusion seems plainly at variance with the picture we derive from the detailed testimony of record as to the operations and purposes of the Hospital, the nature and extent of services performed, and the number of patients compared to the number of staff physicians.

Petitioner relies principally upon *George Winchester Stone, Jr.*, 23 T.C. 254, and *Wrobleski* v. *Bingler*, (W.D. Pa.) 161 F. Supp. 901. Both cases are readily distinguishable on their facts.

In the *Stone* case the taxpayer received a grant from the Guggenheim Foundation, an organization formed "to promote the advancement and diffusion of knowledge and understanding and the appreciation of beauty, by aiding * * * scholars, scientists and artists * * * in the prosecution of their labors." Fellowships had been granted in 60 different fields of study, with no economic benefit derived by the grantor. Typically a grant would be made to permit the recipient to carry on his chosen projects, using his own work methods.

Stone had received a grant to assist him in carrying on a project selected by him, embracing certain research and data respecting 18th century English dramatic performances. The grantor exercised no supervision, made no suggestions, received no economic benefit, and required no accounting either of time or money. The sole condition of the grant was that the grantee engage in no other activity.

In holding that the amount received was a gift under section 22(b)(3) of the Internal Revenue Code of 1939, we said at page 261:

We have found that the fellowship payment to the petitioner was a gift. On this issue the controlling factor is the intent of the payor. *Bogardus* v. *Commissioner*, 302 U.S. 34 (1937). It is obvious that the foundation intended it as a gift. The object of the foundation is to *aid* scholars, scientists, and artists in the prosecution of their labors. The donor of the capital fund stated that the income was to be used *to provide opportunities for men and women to carry on advanced study.* The secretary of the foundation testified that the fellowship awards were intended as gifts.

And the following language appears at pages 262–3:

The grant was in the nature of a scholarship to facilitate the further education or training of the recipient even though in this case he held several degrees. His research was in a field of his own selection. He was under no obligation to perform services for the foundation or any other person. The arrangement between the foundation and the fellow is not an employment contract. The foundation does not assume or stipulate for authority to direct and control the fellow as to the details and means by which the project is carried out, to require conformity with a schedule of working hours, to supervise the work to see that it is satisfactorily done, or to require reports on the progress of or the completion of the task. The payments are not for services.

In the instant proceeding the VA not only determined what type of work petitioner was to do, but retained and exercised control and supervision at all times over the method of its performance, including the length and number of workdays per week. She was subject to reassignment not only within the Hospital, but to other institutions as well. And, finally, her activities resulted in substantial economic benefit to the grantor, since she performed valuable professional services of a nature essential to the carrying out by the Hospital of its principal purpose, the care and treatment of patients.

In *Wrobleski* the taxpayer, a physician, received a stipend from the University of Pittsburgh as a participating graduate physician in its training program at the Western State Psychiatric Institute and Clinic. Its purposes are described in the Findings of Fact as follows:

6. The Western State Psychiatric Institute and Clinic, established by the Commonwealth of Pennsylvania and leased to the University of Pittsburgh for the sum of $1 a year, was designed to serve primarily as a center for research and education of students and specialists in the field of emotional illness and health. The use and some of the purposes of the Institute have been defined by statute which provides, in part, as follows:

"The Western State Psychiatric Institute and Clinic, located in Allegheny County, shall be used for study and research into the causes, treatment, prevention and cure of the various types of nervous disorders and mental diseases. This institute shall also provide training and teaching both at the undergraduate and at the graduate level of students who, upon graduation, will enter the practice of general medicine, with a technical background of training in mental illness, as well as for the purpose of taking up the great gap between the number of qualified psychiatrists and the number who are needed as a result of the constantly mounting number of persons needing attention for mental disorders." 1949, May 20, P.L. 1643, § 1, 50 P.S. Pa. § 575.1. Other purposes, described by the statute, are the provision of courses of study for personnel of the various mental hospitals throughout the Commonwealth, the pursuit of studies for the prevention of mental and nervous disorders of children, the training and teaching of nurses and other personnel needed in the treatment, care and prevention of mental disorders and the study of problems of administration to the end of developing an effective, humane and economical policy for the care of mental illness in Pennsylvania.

The purpose of admitting and treating patients, and the purpose and value of any services performed by taxpayer and those similarly situated are described in the Findings of Fact in the following language:

13. Because it is not primarily a service organization, the Institute has fewer patients than the ordinary state mental hospital. Its patients are carefully selected, in part, from persons already confined to state mental hospitals and, in part, from persons with mental or emotional disturbances who volunteer for admission to the Institute.

14. The admission of selected patients is designed to bring into the Institute a cross-section of the types of cases the staff believes necessary for teaching,

research and training, including the training of the fellows in the training program in psychiatry.

15. The Institute employs a full time staff of 17 psychiatrists; in addition it enjoys the services of the psychiatric staff of the Medical School of the University of Pittsburgh, of which it is a part. The fellows do not replace personnel who would otherwise have to be employed by the Institute to care for patients.

16. In addition to participation in the care and treatment of patients, fellows in the training program in psychiatry are required to serve as instructors for nurses and medical students. Such instruction is closely supervised and is intended primarily to improve the ability of those in the training program to transmit knowledge of complex subject matters of their field as well as to aid in their own learning and investigations.

It was found as an ultimate fact that the taxpayer was not primarily performing services for the Institute or University. The grant was accordingly afforded the benefits of section 117.

Here the Hospital was organized and operated for the care and treatment of patients, who were admitted solely on the basis of veteran status and actual need for hospitalization. The value or worthlessness of any given case to the training of residents or advancement of science was a matter of total indifference insofar as admissions were concerned. The adoption of a resident trainee program and the appointment of persons such as petitioner to residencies were merely incidental to and for the purpose of facilitating the *raison d'etre* of the Hospital, namely, the care of its patients.

Thus, the case at bar presents a picture diametrically opposed to that in *Wrobleski*, where the institution existed for training purposes, and the admission of patients was merely incidental to and based primarily on the needs of the training program, rather than those of the patient.

Whatever the value to petitioner of any training and experience received by her, and whatever her aims and purposes in accepting the position, she in fact performed valuable services and received the amount in question as compensation therefor. Respondent's determination must be sustained.

*Decision will be entered for the respondent.*