Donald R. DiBona and Randi I. DiBona v. Commissioner.
Di Bona v. Commissioner
Docket No. 3563-66.
United States Tax Court
T.C. Memo 1968-214; 1968 Tax Ct. Memo LEXIS 86; 27 T.C.M. (CCH) 1055; T.C.M. (RIA) 68214; September 24, 1968. Filed *86 Facts: Petitioner, a candidate for a Ph.D. degree, performed services under a teaching assistantship for which he received monthly payments from Iowa State University. He excluded these payments from his gross income as a scholarship or fellowship grant pursuant to section 117, I.R.C. 1954. Held: The amounts received by petitioner do not represent payments under a scholarship or fellowship grant since these payments were primarily for the purpose of compensating petitioner for services rendered rather than for the primary purpose of furthering his own education and training. Held, further: In order for section 117(b) to be applicable, there must first be a scholarship or fellowship grant, neither of which petitioner held. Lioyd Karr and Clara Mann Judisch, for the petitioners. James T. Finlen, Jr., for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: The respondent determined a deficiency in petitioners' income tax for the taxable year 1964 in the amount of $322.41. The parties have made concessions which can be given effect in a Rule 50 computation. The sole issue remaining for our decision is whether the sum of $520 received by petitioner is excludable *87 from gross income under section 117(a) (1), Internal Revenue Code of 1954, [1] as a "scholarship or fellowship" grant. Findings of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is hereby incorporated by this reference. Donald R. DiBona (hereinafter petitioner) and Randi I. DiBona, husband and wife, were residents of Ames, Iowa, on the date they filed their petition in this proceeding. They timely filed a joint Federal income tax return for the calendar year 1964 with the district director of internal revenue at Des Moines, Iowa. Petitioner received a bachelor of science degree from Harvard University in 1960. After completing his undergraduate education he was employed for three years by Massachusetts General Hospital as a technician in electronic microscopy. Petitioner was admitted to and first enrolled at the Graduate College of Iowa State University of Science and Technology (hereinafter ISU) in September 1963. In his application for admission thereto, petitioner indicated that he would seek a Doctor of Philosophy degree (hereinafter Ph.D.) *88 with major emphasis in cell biology and that he intended to pursue a career in biological research. Petitioner received the Ph.D. from ISU in August 1966. His major emphasis during his graduate work there was in cell biology. ISU does not require a master's degree in order to receive the Ph.D. There are three types of financial assistance available to graduate students at ISU. They are using ISU's nomenclature: (1) fellowships and traineeships, which are outright grants to "superior" students requiring no duties by the respective recipients and which are financed generally by government and industry (although generally administered by the university); (2) assistantships, both teaching and research, which are appointments to the university staff requiring 1056 services which are financed out of the regular university budget for employees; and (3) part-time labor available to any student. In ISU's nomenclature the term "scholarship" is restricted to undergraduate grants. Petitioner at no time applied for or held a fellowship or traineeship. Nor when he first enrolled at ISU was he eligible for an assistantship since he had to first prove his capabilities as a graduate student. However, *89 in 1964 petitioner was granted a teaching assistantship for which he received $130 per month for the months of September, October, November, and December 1964, or a total of $520 for that period. His appointment was for the nine-month academic year beginning September 1964. During 1964 petitioner received additional amounts from ISU for research which was not related to his teaching assistantship and, therefore, is not in issue here. An academic year at ISU is divided into four quarters consisting of three months to each quarter. The fall quarter embraces the months of September, October, and November; the winter quarter the months of December, January, and February; the spring quarter the months of March, April, and May; and the summer quarter the months of June, July, and August. The course petitioner was responsible for teaching during the period of his teaching assistantship, which began with the fall quarter of 1964, deals with the use of the electronic microscope in biological research and was officially listed in ISU's catalog as "Biochemistry and Biophysics 575." It is among those normally taught graduate students. Petitioner fully understood at the beginning of the fall quarter *90 that the $130 monthly payments were for teaching. However, petitioner did not actually first teach this course in electronic microscopy until the winter quarter beginning in December 1964. Nevertheless, he would have taught it during the fall quarter as well if there had been a demand for the course, which there was not since not enough students were interested or qualified to take the course that quarter, even though it was listed in the catalog for all quarters during the academic year. A prerequisite course was given during the fall quarter to qualify students for the course petitioner was to teach. Even though petitioner did not actually teach the course that he was paid and responsible for during the fall quarter, he began preparations during that period to teach it the following quarter. Furthermore, petitioner during the fall quarter occasionally gave demonstrations and performed services with regard to other formal courses. When he began teaching the course during the winter quarter, it met for two afternoons a week in the laboratory. In 1964 ISU did not impose a minimum teaching requirement on every graduate student who pursues a Ph.D. However, this did not preclude a department *91 head or the student's major professor from requiring teaching as a prerequisite to obtaining a degree. In 1964 petitioner's major professor, Dr. L. Evans Roth, had made it understood that all students under his supervision and control would have to teach at least one quarter. Thus, any student under his direction generally had to teach at least one quarter whether or not the department itself imposed any teaching requirement. However, the record does not indicate whether all students under his direction actually did teach at least one quarter. Nor does the record indicate whether those students who did teach for one quarter were paid anything at all if they were not on a teaching assistantship or even whether or not all students had to hold an assistantship in order to teach. Finally, the record does not indicate that petitioner had any knowledge at the time he was informed that he received the assistantship that he would be required to teach at least one quarter as a condition to receiving his Ph.D. degree. Petitioner took his written preliminary examination for his degree in late spring 1965 and his oral preliminary examination about a month later in July. The teaching experience *92 gained as a result of the assistantship was of "some benefit" to him in preparing for and taking these examinations. Federal income taxes were withheld by ISU from the compensation received by petitioner as a graduate teaching assistant and ISU duly paid the social security taxes due the Federal Government as a result of the payments made to petitioner. ISU also made up "personnel action sheets" on petitioner. However, ISU maintains no such sheets for fellowship grantees nor does it withhold Federal income taxes from the amounts received by fellowship grantees. During the spring quarter of the 1966-67 academic year (beginning in September 1057 1966) there were approximately 2,500 graduate students at ISU. Of this total 934 held assistantships (of which about two-thirds were research assistantships) while 214 were on fellowships. Of the remaining graduate students all but about 300-400 received some form of financial assistance. While neither 1966 nor 1967 is in issue, these figures are not significantly different from the latter part of 1964, which year is in issue herein. It is expected by ISU's administration that all teaching assistants will render services to the university; it *93 would be improper for a student to hold such an assistantship and not render services therefor. The fact that some students may hold such an assistantship and not render services is probably the result of administrative error; the administrativee officers would not knowingly approve such an arrangement. Not all teaching assistants are required to be in charge of teaching a particular course; many fulfill their obligation under the assistantship by simply assisting in the teaching function and in other ways performing services. The amounts received by graduate teaching assistants teaching part time is no greater than the amounts regular staff instructors would receive for the same services. The source of funds used to pay graduate teaching assistants is from general university funds which are used to pay all professors and instructors. ISU does not have authority to grant fellowships from these funds and it does not do so. The principal source of revenue for ISU's general budget is derived from state appropriations and matriculation and course fees from students. ISU's administrative officers believe that an employer-employee relationship exists between each graduate teaching assistant *94 and the university as far as his teaching function is concerned. The teaching assistant, like a regular staff member, is subject to his department chairman when his performance is not adequate as a teacher. If, however, his academic performance is unsatisfactory, then his major professor also has authority over him. A student-teacher relationship exists between each student and his major professor. If ISU did not employ teaching assistants, it would be necessary to hire other teachers or instructors to perform the teaching. Generally, the department chairman of each department requests a spedific number of teaching assistants for the ensuing academic year and his request is approved by the University if there is a demonstrated need for teaching services and if sufficient funds are available. There are normally more applicants than positions avilable. A person is appointed as a teaching assistant only if there is a need for teaching to be done and if he appears qualified for the position. Petitioner was chosen as a teaching assistant because of a need for assistance in the course that he taught and because he had the best experience in this area. No one may hold an assistantship at *95 ISU unless he is also an enrolled graduate student. Although the graduate programs at ISU are designed to prepare the students for careers in research, ISU recognized no difference in status between a research assistantship and a teaching assistantship, other than the fact that the latter is paid $10 per month more. Nor does the business office of ISU make any distinction in the treatment of the two types of assistantships for its purposes. Teaching assistants, unlike full-time professors and instructors, generally are not listed officially as members of the faculty staff. If a regular instructor is also taking courses toward a Ph.D., he may be officially both a member of the faculty staff as well as a graduate student, but he is not classified as a teaching assistant. As a staff member, even though he may also be taking courses, he is entitled to all prerogatives of that status that teaching assistants are not entitled to. Some of the privileges not accorded to teaching assistants that instructors and other regular staff members are entitled to include: parking privileges, participation in retirement programs, use of certain university resources and facilities, and tenure. On the *96 other hand, the tuition paid by assistants is reduced below the amount paid by graduate students who are not also teaching or research assistants. Even though a teaching assistant is not officially a member of the faculty staff, he is nevertheless a part-time employee and as such comes under some but not all of the regulations and employment policies applicable to other employees. If he has been teaching for a while, he may be given a raise in recognition of his additional experience. He may be required by his department head to attend regular instructional staff meetings. As a graduate student, however, if he gets into difficulty, he is subject to the disciplinary action of the dean of students. If a teaching assistant's academic work necessitates his placement on probation or is otherwise unsatisfactory, his assistantship 1058 would probably be terminated. One reason for this is that the student will then have more time to concentrate on his studies. If a student is relieved of the assistantship for academic reasons, the assistantship could terminate at the end of the current quarter, although normally it is continued through the academic year unless the student is doing very poorly. *97 Petitioner excluded from his gross income in 1964 the $520 paid by ISU for his four months in the position of a teaching assistant in 1964. Respondent determined that such an amount was not excludable. Ultimate Findings of Fact The amounts paid to petitioner constituted compensation for services rendered. The primary purpose of the payments pursuant to the assistantship was to compensate petitioner. Petitioner did not hold a scholarship or fellowship grant during the taxable year. Opinion Petitioner herein contends that the payments he received from ISU as a teaching assistant should be excluded from his income by virtue of section 117(a) which in pertinent part reads as follows: SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS. (a) General Rule. - In the case of an individual, gross income does not include - (1) any amount received - (A) as a scholarship at an educational institution (as defined in section 151(e) (4)), or (B) as a fellowship grant, * * * It is quite apparent upon an initial reading of this section that it shall not be applicable unless there is first a "scholarship" or "fellowship grant." Whereas generally it is a perfunctory determination whether or not certain payments *98 represent either a scholarship or fellowship grant, a stumbling block is quite frequently encountered when the recipient of the payments is required to perform services for the payor. In such a case, we have often been faced, as we are here, with the question of whether the payments in question represented compensation on the one hand or a scholarship or fellowship grant on the other. Only in the latter case could the payments therefor be excludable. See Elmer L. Reese, Jr., 45 T.C. 407 (1966), and Stephen L. Zolnay, 49 T.C. 389 (1968), and the cases cited therein. Thus, our initial inquiry should be into the question of whether or not the payments petitioner received herein constituted "compensation for services." Ethel M. Bonn 34 T.C. 64 (1960). However, a determination that the payments represented compensation for services would not, without more, mean that the payments petitioner received should be included in his gross income. To be included in income, the arrangement between the parties must be primarily one of employment and the payments, even though for study or research, must be primarily payments of compensation rather than for the primary purpose of enabling the recipient *99 to carry on the studies or research in furtherance of his own education and training. [Emphasis added.] [Aileene Evans], 34 T.C. 720, 726-7 (1960).] Thus, if payments are made primarily to compensate the recipient, they do not represent a scholarship or fellowship grant. This "primary purpose" test has been applied in other decided cases wherein we have attempted to determine whether the payments in question constituted a scholarship or fellowship. See Reese and Zolnay, both supra, and the cases cited therein. The Reese case and Ussery v. United States, 296 F. 2d 582 (C.A. 5, 1961), contain an exhaustive analysis of the historical and legislative background to section 117.[2] *100 Since generally there is a dual or mutual purpose in these cases, the primary purpose in a particular case is usually difficult to resolve and is dependent upon the facts and circumstances of that case. See Zolnay, supra, at p. 395. In the case at bar, however, we believe the record clearly shows both that (1) petitioner was compensated for services that he rendered to ISU and 1059 that (2) the primary purpose of the payments was to compensate petitioner. It is quite clear that petitioner taught courses and was paid therefor. The only apparent basis on which he could argue that he was not compensated for services is that he did not teach during the fall quarter of the taxable year. However, the record clearly shows that both petitioner and ISU expected that he would perform services and that he actually did perform some services. Furthermore, he would have taught the course he was appointed to teach if there had been enough enrolled students to warrant it. In addition, ISU does not generally permit a student to hold an assistantship without performing *101 services. The fact that one performs no services or less than originally contemplated in no way changes the compensation characteristics of the payments that he receives therefor, absent the donative intent requisite for a gift. The intent of the parties, not the services actually performed, is controlling. Likewise, we believe that the record clearly shows that the primary purpose of the payments was to compensate petitioner. This conclusion is based primarily on the way the teaching assistantships were determined and assigned at ISU. The number of teaching assistantships was not dependent upon the number of qualified nonfellowship students in need of financial assistance. Rather, the number was dependent upon the need for teachers and the availability of funds to pay teachers. If a graduate student were not available to teach a course, a "regular" staff member would be hired to teach it. If there were no teaching positions open, an otherwise qualified student would not receive a teaching assistantship; apparently no teaching positions would be added merely to accommodate a student in need of financial assistance. The only conclusion that we draw from this is that when ISU needed *102 teachers, qualified graduate students were selected therefor when available. While it is true that payments for the teaching might enable the student to further his own education and training, it is equally clear that the primary purpose of such payments is to compensate the recipient. Any benefit to the recipient, whether in substantive knowledge, self-confidence, or economical (such as tuition reduction) appears to be strictly incidental. Other factors which we have used in our determination that the primary purpose of ISU's teaching assistantship was to compensate petitioner include the fundamental fact that petitioner understood from the beginning of the fall quarter that he was to be paid for services rendered. In addition, the source of funds used to pay teaching assistants is from the general university budget which is used to pay all professors and instructors; ISU does not have authority to grant fellowships from these funds and it does not do so. Furthermore, the department chairman generally treats all teaching assistants in his department as employees and ISU believed that an employer-employee relationship exists between each teaching assistant and the University. [3] In *103 this regard ISU withheld Federal income tax from their "salary" payments, while this was not done in distributing the funds administered by ISU to the fellowship recipients. [4] While it is true that a student-teacher relationship existed between each teaching assistant and his major professor with regard to the student's graduate studies and also in some respects with regard to his teaching, this in no way diminishes the predominant or primary relationship of employer-employee of ISU to each teaching assistant. An employer-employee relationship and a student-teacher relationship, contrary to petitioner's contention, are not mutually exclusive. Petitioner also points to several differences in the privileges accorded regular staff members not generally accorded teaching assistants and vice versa. He concludes from this that the teaching *104 assistants could not be employees. While it is true that these differences existed, this in no way precludes our finding that an employer-employee relationship existed between the teaching assistant and ISU. Any proposition that an organization may not have several categories of employees each with different privileges is without merit and does not warrant further discussion. In addition, petitioner stresses the fact that ISU administratively trated teaching assistants no different from the manner it treated research assistants. Since, petitioner concludes, ISU research assistants can exclude payments under their assistantships by virtue of section 117, a fortiorari teaching assistants should also be permitted to exclude amounts they receive under their 1060 assistantships. We find little merit in this reasoning. In the first place, we are aware of no case which holds that an ISU research assistant may take advantage of the general rule of section 117(a). Secondly, this case deals with a teaching assistant, not a research assistant; how we might treat an ISU research assistant for purposes of section 117 is irrelevant to the case at bar. Since the issue herein is factual, we confine *105 our holding strictly to the facts of this case. Although both fellowships and assistantships at ISU provide financial assistance to its students, petitioner erroneously assumes that the primary purpose of both forms of financial assistance is to enable the recipients to further their own education and training. An ISU fellowship, which petitioner admits he did not hold during the taxable years, [5] *106 is a form of financial assistance for "superior" students from whom no services are required. If the primary purpose of both forms of financial assistance is to enable students to help pay for their graduate studies, why differentiate between fellowships and assistantships? Why should not ISU give every qualified student a fellowship? The answer to these questions lies in the inherent difference between an ISU fellowship and an ISU teaching assistantship: whereas the primary purpose of the former is to enable the recipient to further his own education and training, the primary purpose of the latter, we conclude, is to compensate the recipient. Finally, petitioner contends that the exclusionary rule of section 117(a) should apply because a teaching requirement was imposed on all candidates for the degree petitioner sought irrespective of whether or not they held teaching assistantships. He bases this argument on his interpretation of section 117(b)[6] *107 which he believes establishes a mechanical test wherby payment for services required of all degree candidates would automatically fall within the exclusionary rule of 117(a). Even assuming that the record in this case clearly indicated that teaching was required of all Ph.D. candidates, which it does not, we would disagree. The limitation and the exception thereto in section 117(b) is inapplicable unless we first determine that there is a scholarship or fellowship, and we have held herein that petitioner held neither. As we stated in Reese, supra, at p. 413: We think that a proper reading of the statute requires that before the exclusion comes into play there must be a determination that the payment sought to be excluded has the normal characteristics associated with the term "scholarship." Only if the "amount received" is a "scholarship" does the limitation and the exception thereto become operative. [Emphasis added.] In other words, we turn to section 117(a) and the limitations in 117(b) only after we decide that there is a scholarship or fellowship involved. If, on the other hand, the payments do not have the "normal characteristics" of a scholarship or fellowship, then it is not necessary to look at section 117 and the mechanical *108 tests therein. Reese and Zolnay, both supra. The Third Circuit has followed this approach in Johnson v. Bingler, 396 F. 2d 258 (C.A. 3, June 5, 1968). Therefore, any finding that teaching was required of all candidates for the degree sought by petitioner would be irrelevant since we have held that petitioner was not a recipient of either a scholarship or fellowship grant as a result of his failure to show that the primary purpose of the payments was to further his education and training rather than to compensate him for services rendered or to be rendered. See Reese, supra, p. 416. The payments petitioner received as a teaching assistant are, therefore, taxable as compensation for services rendered. To reflect the concessions of the parties. Decision will be entered under Rule 50. 1061 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954.↩
2. Our application of the "primary purpose" test as it is used herein is inherent in the legislative and judicial history of the scholarship area and exists wholly independent from any such test in respondent's regulation section 1.117-4(c), the validity of which has been questioned. See Johnson v. Bingler, 396 F. 2d 258(C.A. 3, June 5, 1968); 1 Mertens, Law of Federal Income Taxation, sec. 7.42, pp. 106-118; and 46 Taxes 485-493 (August 1968). Since we too have found this regulation somewhat cumbersome, we await the fulfillment of respondent's announced intention to revise his regulations under sec. 117. See Reese, supra, p. 416↩, footnote No. 6.
3. We recognize that even though ISU considers an employer-employee relationship to exist, this does not necessarily establish such a legal relationship. ↩
4. We also recognize that this factor, considered alone, is not determinative of an employer-employee relationship. See Chander P. Bhalla, 35 T.C. 13, 17-18 (1960); and Stephen L. Zolnay, supra, at p. 398↩.
5. Petitioner contends that he held a "scholarship" rather than a "fellowship." While we agree with his contention that we should not be bound by ISU's application of that term only to undergraduate grants, we feel the distinction is immaterial in this case.
6. The general rule of section 117(a) providing for exclusion from gross income of scholarship or fellowship grants is limited by the first sentence of section 117(b) which provides that 117 (a) shall not apply to that portion of any amount received by a degree candidate which represents payment for part-time employment services required as a condition to receiving the grant. However, the last sentence of section 117 (b) is an exception to the general limitation in the first sentence of 117(b). It provides that if services are required of all candidiates for a particular degree as a condition to receiving such degree, such services shall not be considered as part-time employment for purposes of the first sentence of 117(b).