Larry R. Taylor and Nell V. Taylor v. Commissioner.
Taylor v. Commissioner
Docket No. 1121-70.
United States Tax Court
T.C. Memo 1972-20; 1972 Tax Ct. Memo LEXIS 234; 31 T.C.M. (CCH) 57; T.C.M. (RIA) 72020; January 27, 1972, Filed. Larry R. Taylor, pro se, 3308 Tennessee, N. E. Albuquerque, N. M. Frederick B. Strothman and David E. Gaston, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: A deficiency in income tax has been determined by the Commissioner against the petitioners for the taxable year 1967 in the amount of $656.28. The only issue presented by the pleadings is whether respondent has erred in adding to petitioners' gross income certain amounts excluded from their income by petitioners as claimed scholarship or fellowship receipts under section 117, I.R.C. 1954. Findings of Fact All facts which have been stipulated are found accordingly. Petitioners, who resided at Albuquerque, New Mexico, at the time the petition herein was filed, filed their Federal income tax return with the district director *235 of internal revenue, Wichita, Kansas, for the calendar year 1967. Petitioner Larry R. Taylor was a medical doctor during the year 1967 and was enrolled in the Menninger School of Psychiatry (hereinafter Menninger School) as a nondegree student during all or part of that year. The Menninger School is a branch of the Menninger Foundation (hereinafter Foundation) of Topeka, Kansas, a nonprofit center for professional education, research and treatment in the field of psychiatry. The Foundation consists of five major departments: professional education, research, psychoanalytic training, social psychiatry, and the Menninger Clinic. The professional education department (now the Menninger School) was established after World War II in response to the then urgent need for trained psychiatrists. In establishing this department, the Foundation departed from the traditional method of training psychiatrists, which had formerly been accomplished by preceptorships. Instead, the method adopted by the Foundation, and now generally used by universities, contemplated a program of residency coupled with a program of graduate study with an established curriculum in the field of psychiatry. For the *236 year in question, the American Board of Psychiatry and Neurology (hereinafter the Board) required a residency term of 3 years, in addition to 2 years of post-residence experience, before it would allow a physician to appear before its examiners in an effort to qualify as a diplomate in psychiatry. Accordingly, the residence program undertaken by the petitioner herein was geared to meet the Board's requirements. Petitioner (hereinafter sometimes referred to as a fellow) entering the Menninger School was, accordingly, assigned as a resident to one of the hospitals in Topeka affiliated with the school. He would thereafter be associated with such hospital for either a 3-year or 5-year period of residency. Congress, by Act of January 3, 1946 (38 U.S.C.A. 15), established the Department of Medicine and Surgery in the Veterans Administration and at the same time authorized the establishment of residency programs in medicine. Under authority of this Act, on July 19, 1951, a contract was entered into between Veterans Administration Hospital at Topeka, Kansas (hereinafter the TVAH), and the Foundation whereby the Foundation for a consideration agreed to provide TVAH *237 residents with a course of study in psychiatry. Pertinent provisions of this agreement read as follows: AGREEMENT BETWEEN VETERANS ADMINISTRATION AND THE MENNINGER FOUNDATION, TOPEKA, KANSAS
WHEREAS, the Veterans Administration, in the execution of laws it is charged with administering, has determined the necessity of maintaining a course of instruction and training in psychiatry for Veterans Administration residents at the Veterans Administration Hospital at Topeka, Kansas, which the Veterans Administration with present personnel and facilities is not able to furnish, and WHEREAS, The Menninger Foundation, a corporation, situated at Topeka, Kansas, is available to render professional services necessary for the operation and maintenance of such course of instruction and training in psychiatry to the extent specified in paragraphs 1 and 2 hereof, agreement is hereby entered into between the Veterans Administration and the Menninger Foundation, hereinafter referred to as the Contractor, as follows: 59 1. The Contractor agrees, subject to approval by the Veterans Administration, to plan and to provide general supervision of a course of instruction and training to be given *238 residents in psychiatry at Veterans Administration Hospital, Topeka, Kansas. This includes lecture courses, seminars, section conferences, training in neuropathology and neurophysiology and other appropriate instruction and training as required by the Veterans Administration for residents in psychiatry. The instruction and training planned and supervised by the Contractor must meet all the requirements to qualify Veterans Administration residents for acceptance to examination given by the American Board of Psychiatry and Neurology in addition to the requirements hereinafter required by the Veterans Administration. Schedule No. 1, attached hereto, is provided as a guide for the Contractor in preparing material for conducting the training required herein. The manager, Veterans Administration Hospital, Topeka, Kansas, is authorized to make such deviations to Schedule No. 1, attached, as required by the Veterans Administration and to meet current or future requirements of the American Board of Psychiatry and Neurology or the Veterans Administration. 2. In addition to the services to be rendered as described in paragraph 1, hereinabove, the Contractor agrees to provide all necessary supervision *239 of the course of instruction and training for residents in psychiatry at Veterans Administration Hospital, Topeka, Kansas. This not only [includes] supervision of the program of instruction and training, but also includes supervision of such supplementary instruction and training as may be furnished by the Veterans Administration from its own staff or otherwise, when such supplementary instruction or training is deemed necessary by the Veterans Administration. * * * 3. In consideration of the services as provided in paragraphs 1 and 2 above, the Veterans Administration agrees to pay the Contractor the sum of $50,000 per year for such services, providing a minimum of 40 Veterans Administration residents are on duty, * * *. Veterans in residency training at the Veterans Administration Hospital, Topeka, Kansas, and accepting benefits under the above cited statute shall be charged by the Contractor the same fee as charged for other Veterans Administration Residents. Such charges shall be for the purpose of this paragraph the sum of $833.00 per year. * * * Further, the sum for which the Contractor is entitled for reimbursement will be reduced by $833.00 per year for each position for *240 residents in psychiatry not filled below the number of 40, exclusive of the veteran residents in training and receiving benefits under the above cited law. * * * 6. * * * The Manager, Veterans Administration Hospital, Topeka, Kansas is charged with the responsibility of insuring that the services performed by the Contractor, as specified in paragraph 1 and 2 above, meet the requirements of the Veterans Administration * * *. 7. The Contractor agrees to submit in writing to the Veterans Administration during the period of the contract, at intervals specified by the Veterans Administration, reprts of the progress of the residents receiving instruction and training under the terms of this agreement, furnishing such information as the Veterans Administration may require. 8. Duly authorized representatives of the Veterans Administration shall be permitted to visit the Contractor and to examine the training facilities and the work of the residents receiving instruction and training under this agreement. A copy of the schedule of studies to be followed by each resident shall be made available to the Veterans Administration. * * * 11. * * * For the purposes of this paragraph it is understood *241 that the tuition rate per residnet per year is $833. The Veterans Administration charged the amount paid to the Foundation for furnishing the course of instruction in psychiatry to an account designated "education and training." TVAH is a general service veterans hospital. Priority of admission is given to persons with disabilities arising from military service. Others are admitted when facilities are available. Though TVAH admitted patients on a general basis, the majority of the persons treated suffered from mental disturbances and ailments of a psychiatric nature. During the year in question, TVAH operated a 5-year residency program as well as the 3-year program referred to above. The training received and services performed by 5-year residents during their first 3 years of residency were identical to those which were experienced by the 3-year residents. The only differences between the 3-year and 5-year programs were that those residents who participated in the latter program received higher stipends and were obligated to provide 2 years of additional service upon completion of their first 3 years of residency. 60 The following contract (for which there was no "three-year" *242 counterpart) between petitioner Larry R. Taylor and TVAH outlines the nature of the commitment required of all 5-year residents associated with TVAH: CONTRACT TO RECEIVE CAREER RESIDENCY TRAINING IN A SPECIALTY AND PERFORM OBLIGATED SERVICE I. Dr. Larry R. Taylor, having been accepted for employment as a Resident in the Department of Medicine and Surgery of the Veterans Administration, and training in Psychiatry, to commence immediately at the VA Hospital, Topeka, Kansas, agree, in consideration of such employment, specialty training, and salary comparable to that regularly received by a full-time physician or dentist, Full Grade, to the following terms and conditions: 1. a. While receiving residency training contemporaneously with performance of service in the Department of Medicine and Surgery of the Veterans Administration, it is agreed that my salary shall be the same as that regularly paid a full-time physician or dentist of equal Grade (at the time of my appointment or subsequent promotion), and it is further agreed that while I am in training status under this contract I shall be accorded the rights, privileges, benefits, and emoluments of a full-time physician or dentist *243 in the Department of Medicine and Surgery of the Veterans Administration, as are provided by the applicable appropriate regulations. b. While I am rendering obligated service under this contract it is agreed that I will be paid the regular salary of a full-time physician or dentist in the Department of Medicine and Surgery of the Veterans Administration in the Grade at which I am appointed or to which I may be promoted and that I will be entitled to all the rights, privileges, benefits, and emoluments of such a full-time physician or dentist, as are provided by the applicable appropriate regulations. 2. It is agreed such residency training shall be for such period of time and embrace such subjects and types of training and shall be provided continuously, for such periods and with such intermissions as the Veterans Administration may determine. 3. I will accept any transfer directed by the Veterans Administration from one station to another station for completion of training, same to be at Veterans Administration expense with respect to me and my family and my household goods insofar as the then applicable Veterans Administration regulations will permit. 4. The duration of training, *244 as determined by the Veterans Administration, will be for three years. The training will be comparable to the training received by a regular resident at the following grade levels: Junior for the 1st yr. of residency training; Intermediate for the 2nd yr. of residency training or its creditable equivalent; Senior (1st Yr.) for the 3rd yr. of residency training or its creditable equivalent. In consideration of the training furnished under this agreement I obligate myself to remain in the employment of the Veterans Administration as a full-time physician or dentist in the Department of Medicine and Surgery in the field of Psychiatry for the following period of time in addition to the period spent in training status as a resident. a. If I receive 6 to 17 completed months of residency training under this contract, I will render one month of obligated service for each completed month of training. b. If I receive 18 to 26 completed months of residency training under this contract, I will render 18 months of obligated service. c. If I receive 27 to 36 completed months of residency training under this contract, I will render 24 months of obligated service. d. If I receive 37 or more *245 months of completed residency training under this contract, I will render 24 months of obligated service plus 1 month for every month of residency training in addition to 36 months. 5. a. The Veterans Administration shall be entitled to such obligated service as I shall become liable to, in whole or in part, at the time considered most appropriate, as mutually agreed by the Directors of the training station and the obligated service station, which normally would be upon completion of training. In the exceptional event that such obligated service occurs prior to the completion of my training, the transportation of myself, and family, if any, and my household goods to the station where obligated service is rendered and return to the parent station will be at Veterans Administration expense within the limits of the then applicable Veterans Administration regulations. b. I agree to render the obligated service to which I am liable under this contract at any station designated by the Chief Medical Director of the Veterans Administration. I agree to accept 61 obligated service at a station other than that in which I receive training. 6. Nothing herein shall be construed so as to *246 create an obligation on the Veterans Administration to pay me any specific salary or to retain my services for any specific period; both of such matters being governed by the appropriate regulations from time to time effective and applicable to physicians or dentists employed full-time in the Department of Medicine and Surgery of the Veterans Administration. 7. a. Unless my employment or training status shall be earlier terminated by the Veterans Administration, I will be obligated to continue said employment in the Department of Medicine and Surgery of the V.A. in the specialty in which I have received training under this contract, at such station or stations as may be designated by the Chief Medical Director of the Veterans Administration, during the period of obligated service as above described. In the event I terminate my status as a career resident before the end of the sixth month of training, or in the event of my failure to perform obligated service due, it is now agreed that I shall pay to the Veterans Administration, as restitution and not as a penalty, an amount which constitutes 90 percent of the difference between the total salaries which I actually receive during *247 my training period and the total salaries which a regular resident at comparable grade levels and maximum salaries would receive during the same period. The total amount of restitution will be reduced for each month of completed obligated service at a rate determined by dividing the total amount of restitution by the total number of months of obligated service due at the completion of training. b. In case the services required by this contract are not completed and result in restitution due the Veterans Administration in accordance with paragraph 7.a. above, it is agreed that all amounts due which represent accrued leave and retirement deductions will be applied against the indebtedness, and any balance remaining will be due and payable in amounts which will completely liquidate the amount of restitution due in not more than 24 monthly installments from the date of breach of the contract. Agreed upon the 1st day of December 1965, at Topeka, in the State of Kansas. The contract between petitioner Larry R. Taylor and TVAH was modified on September 30, 1969, as follows: Paragraph 7 of the career residency in psychiatry and performance of obligated service of Dr. Taylor, signed *248 and dated December 1, 1965, is modified as follows: The amount of restitution will also be reduced at a rate of 1/2 month of completed obligated service for each month of accomplished part-time obligated service. The 2 years of obligatory service under the above agreement was sufficient to satisfy the 2 years of experience required by the Board as a prerequistie to qualification as a diplomate in psychiatry. A 3-year resident could at any time apply for a 5-year residency. If he were accepted, his past salary payments could be adjusted to reflect the higher payments received by 5-year residents. Petitioner Larry R. Taylor was a 5-year resident. Residents at TVAH were charged tuition by the Menninger School in the amount of $833 per year. Residents associated with TVAH were relieved of their tuition obligation by the hospital. Money used to pay tuition fees for residents was charged to TVAH's "education and training" fund. Since the program of study was of a 3-year duration, fourth- and fifth-year residents did not attend classes and were not liable for tuition payments. Residents at TVAH were paid by their respective institutions in accordance with a predetermined salary schedule *249 which specified the amount of compensation to which each physician was entitled, be he a resident or staff member. At TVAH amounts paid to residents were charged to a "patient care" account - the same account to which salaries paid to staff physicians were charged. The "education and training" account at TVAH was by contrast primarily funded to meet the annual cost of the previously mentioned education contract with the Foundation. Residents at TVAH acquired annual leave and sick leave. If a resident's unexcused time away from the hospital exceeded the number of annual leave days available to him, he would be denied pay for that period of his absence which exceeded the number of leave days available to him. During their first 3 years, 5-year residents were not allowed to use leave days at a rate greater than that which was available to 3-year residents. At TVAH, Federal withholding tax and state withholding tax were deducted by the hospital from the amounts paid to each resident. In addition, FICA tax was withheld from the amount paid each 3-year resident and civil service retirement money was withheld from the amount paid each 5-year resident. The type of clinical experience *250 that a resident must have to eventually qualify as 62 a diplomate in psychiatry is formulated by the Board. For the year in question, the Board required that each resident gain extensive inpatient training as well as experience in neurology (3 to 6 months) and child psychiatry (6 months). Additional time in outpatient work, research, community psychiatry, or industrial psychiatry was also required. Accordingly, each of the residency programs was designed to acquaint the young physicians with on-the-job training in the areas specified above. Those skills which could not be acquired at the specific hospital to which a resident had been assigned were (during his second or third year of residency) acquired at one of the other participating Federal or State hospitals, or at one of the specialized governmental institutions in the Topeka area. A resident's typical day at TVAH began at 8 a.m. and ended at 5 or 6 p.m. However, residents were encouraged not to watch the clock. During the academic years beginning July 1, 1966, and July 1, 1967, they attended classes at the Menninger School during their normal working hours. A first-year resident's typical work day began with the morning *251 report at which time information regarding the recent behavior of patients assigned to the resident was conveyed by the resident to members of a medical treatment team which was usually under the supervision of a second-year resident who was in turn responsible to a staff physician. Had a staff physician been assigned to the patient under discussion, he would have delivered the morning report. In the case of a resident, the report was the product of his personal examination of the patient. In this vein though, the examination made by a neophyte resident would have at first been closely supervised by a staff member; as the resident acquired maturity, the staff member involved would increasingly vest the first-year resident with more and more responsibility in making decisions and diagnosing problems. In a similar vein, as the first-year resident acquired expertise, he was expected to assist and supervise members of the treatment team who were not doctors. After the morning report, the young resident and other members of the team discussed in more detail various problems unearthed during the morning report. Again, had a staff physician been assigned to a patient being discussed, *252 he would have had to join in such discussion in the same manner as a resident. Following the team discussion, the resident would normally make his rounds, visiting the 30 or more patients assigned to him by the hospital in the same manner as a staff physician. Here too, supervision would be commensurate with the progress made and knowledge acquired by the fledgling resident. Following a brief lunch, the resident would attend a team intake meeting during which time new patients would be discussed. Had a staff physician been assigned to the new patient, he, like any resident, would have participated in the intake meeting. During the rest of the afternoon, the resident would see more patients, examine tests previously given to patients, talk with social workers and psychologists, interview relatives of patients, process new admissions, and catch up on his paper work which included writing doctor's progress notes, doctor's orders, admission notes, and final summaries. At some time during the afternoon, a resident might have met with his supervisor for about an hour. Such meetings customarily occurred twice a week. Though a staff physician may have been assigned as many as four residents, *253 his patient load was normally unaffected by this added responsibility. Many staff persons viewed their teaching responsibilities as a source of stimulation and accordingly enjoyed the challenge of teaching even though they would probably have functioned more efficiently if there had been no residency program. On Tuesday and Thursday mornings, the routine described above was altered to accommodate time for classroom study at the Menninger School. First-year residents at TVAH were exposed to many different departments within the hospital. Such exposure not only satisfied the requirements of the Board, but also broadened the young physician's awareness of the various facets of psychiatric medicine. However, some departments were staffed by experienced physicians only. Sometimes this was because the personnel of such a department were poor teachers. In addition to the daily regimen outlined above, first-year residents were given primary responsibility for admitting new patients. Each resident could expect to personally admit 55 or 60 new patients during his first year of training. In processing an 63 admission, the resident would conduct psychological and neurological tests in *254 addition to interviewing the new patients. The findings garnered from the interview would then be discussed with a staff physician if time were available for such an exchange, and if the case were not an emergency. The admitting resident would then fill out an admission note, describing fully the condition of the patient. With experience and time, the recommendations contained in the admission note would, if reasonable, be routinely approved by the resident's supervisor. In addition, the resident, over a period of time, would assume more and more of the responsibilities attending the admission of a new patient. These would include discussions with psychologists, conferences with social workers, and on occasion, interviews with the patient's family. Had an experienced staff physician been required to undertake these duties, he might have needed the same amount of time as was used by a resident in completing the admission process. At TVAH, approximately twice a month, each resident was assigned O.D. (Officer of the Day) duty whereby he assumed primary responsibility for administrative duties such as (a) taking care of emergencies, (b) examining and admitting new patients, (c) checking *255 certain parts of the hospital, (d) seeing that all physically ill patients in the hospital received medical care, (e) developing the medical and surgical unit, and (f) making rounds of inpatient sections. O.D.'s at TVAH were on duty from 4:30 p.m. to 8 a.m. during weekdays; however, it appears that O.D.'s working on weekends and holidays put in 24-hour shifts. The typical working day for a secondyear resident customarily began with activities similar to those of a first-year resident, viz., morning reports, team meetings, intake sessions and other related matters. As mentioned earlier, the second-year man conducted many of these meetings and discussions, and was expected to assist his less experienced first-year counterparts. In addition, later in the day, the second-year resident would participate in intake meetings relating to persons in the outpatient clinic. If required, the intake session might be followed by a lengthy interview with the new patient during which time (usually 6 to 8 hours) the second-year resident would evaluate the patient's disorder. Time would also be spent with his supervisor in the same fashion as a first-year resident. During the afternoon, the second-year *256 resident might also have had appointments and might have visited with some of the 5 to 7 inpatients assigned to him. Depending upon their assignment, secondyear residents at TVAH would spend some of their time in either neurological service or psychosomatic service, as opposed to the outpatient clinic. Seminars at the Menninger School were held for second-year men on Mondays between the hours of 4:15 p.m. and 6 p.m. Third-year residents were not required to report to the inpatient section of either hospital. Most of thier time was spent in the neurology and psychosomatic departments (6 months) at TVAH, and at various other institutions as the Kansas University student guidance clinic in Lawrence, the North Kansas Treatment Center for Children, or the nearby Boys Industrial School. While working at any of these last-mentioned institutions, residents at TVAH would continue to receive regular payments from their home hospital even though no services were being performed for their respective home institutions. The experience gained by thirdyear residents at places like the Boys Industrial School (and required by the Board) could not have been gained at either home hospital because *257 of the dearth of patients in their juvenile years. By virtue of annual promotions, the amount paid to third-year residents by TVAH were more than those paid second-year residents which, in turn, were more than those paid first-year residents. On their 1967 joint income tax return, petitioners excluded $3,600 of their payments from TVAH as being a nontaxable scholarship or fellowship grant. The respondent has proposed to include the full amount of payments received by petitioners from TVAH as taxable income. Ultimate Findings of Fact The petitioner Larry R. Taylor provided many services to the hospital which would have been provided by staff psychiatrists had the residency program been discontinued. Substantial changes would have been required in the operation of the TVAH had the residency program been discontinued. Petitioner Larry R. Taylor was an employee of the hospital and was so considered by the hospital. The salary received by petitioner Larry R. Taylor represented solely compensation for 64 personal services rendered or to be rendered to his employer, the TVAH. Opinion The facts before us with the exception of the identity of the petitioners are on all *258 fours with and nearly identical to the facts found in this Court's opinion in Ethel M. Bonn, 34 T.C. 64, and that of the Court of Appeals for the Tenth Circuit in Woddail v. Commissioner, 321 F. 2d 721, affirming a Memorandum Opinion of this Court. On the authority of those cases and for the reasons set forth therein, we have disposed of the issue presented herein by our ultimate findings. Decision will be entered for the respondent.