Kenneth J. Kopecky and Betty J. Kopecky v. Commissioner.
Kopecky v. Commissioner
Docket No. 5023-66.
United States Tax Court
T.C. Memo 1968-215; 1968 Tax Ct. Memo LEXIS 87; 27 T.C.M. (CCH) 1061; T.C.M. (RIA) 68215; September 24, 1968. Filed *87 Facts: Petitioner, a candidate for a Ph.D. degree, performed services under a teaching assistantship for which he received monthly payments from Iowa State University. He excluded these payments from his gross income as a scholarship or fellowship grant pursuant to section 117, I.R.C. 1954. Held: The amounts received by petitioner do not represent payments under a scholarship or fellowship grant since these payments were primarily for the purpose of compensating petitioner for services rendered rather than for the primary purpose of furthering his own education and training. Lloyd Karr and Clara Mann Judisch, 209 1/2 Main, Ames, Iowa, for the petitioners. James T. Finlen, Jr., for the respondent. IRWIN
Memorandum *88 Findings of Fact and Opinion IRWIN, Judge: The respondent determined a deficiency in petitioners' income tax for the taxable year 1964 in the amount of $373.85. The parties have made concessions which can be given effect in a Rule 50 computation. The sole issue remaining for our decision is whether the sum of $1,000 received by petitioner is excludable from gross income under section 117(a) (1), Internal Revenue Code of 1954, [1] as a "scholarship or fellowship" grant. Findings of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is hereby incorporated by this reference. Kenneth J. Kopecky (hereinafter petitioner) and Betty J. Kopecky, husband and wife, were residents of Des Moines, Iowa, on the date they filed their petition in this proceeding. They timely filed a joint Federal income tax return for the calendar year 1964 with the district director of internal revenue at Des Moines, Iowa. Petitioner received his bachelor of science degree from the Iowa State University of Science and Technology (hereinafter *89 ISU) during August 1959. Prior to that date he had never been employed by ISU. At that time he intended to pursue teaching as a career. There are three types of financial assistance available to graduate students at ISU. They are, using ISU's nomenclature: (1) fellowships and traineeships, which are outright grants to "superior" students requiring no duties by the respective recipients and which are financed generally by government and industry (although generally administered by the university); (2) assistantships, both teaching and research, which are appointments on the university staff requiring services by the respective recipients and which are financed out of the regular university budget for employees; and (3) part-time labor available to any student. At ISU the term "scholarship" is restricted to undergraduate students. Petitioner was admitted and first enrolled in the Graduate School of ISU in September 1959. In his application of admission thereto, petitioner indicated that he intended to obtain a master of science degree in mathematics and that he desired a graduate assistanship appointment. Petitioner received a master of science degree with a major in mathematics *90 from ISU in November 1962. From November 1962 until the date of the trial herein (April 1967) petitioner has been a candidate for the Doctor of Philosophy degree (hereinafter Ph.D.) with a major emphasis in mathematics. An academic year at ISU is divided into four quarters consisting of three months to each quarter. The fall quarter embraces the months of September, October, and November; the winter quarter the months of December, January, and February; the spring quarter the months of March, April, and May; and the summer quarter the months of June, July, and August. The summer quarter is divided into two sessions, each lasting approximately six weeks. The following table reflects the graduate teaching assistantship appointments held by petitioner while at ISU, the courses he taught, and the money he received: 1062 Appointment
Quarter and Year
Courses
Money Received
1. Fall, 1959
Math. 101
$420
Winter, 1959-1960
Math. 101
420
Spring, 1960
Math. 102
420
2. Fall, 1960
Math. 101B and Math 211
540
Winter, 1960-1961
Math. 102 (2 sections)
540
3. Spring, 1961
Math. 101C and Math. 110
900
4. Summer - 2nd session, 1961
Math. 101
396
5. Fall, 1961
Math. 101B and Math. 101
675
Winter, 1961-1962
Math. 101C and Math. 110
675
Spring, 1962
Math. 110
675
6. Fall, 1962
Math. 101B, Math. 321 (2 sections)
690
Winter, 1962-1963
Math. 110, Math. 321
690
Spring, 1963
Math. 212
690
7. Fall, 1963
Math. 321 and Math. 322
600
Winter, 1963-1964
Math. 321 and Math. 323
600
Spring, 1964
600
*91 Generally, 100 level courses are those taught undergraduate freshmen students, 200 level courses are taught to sophomores, and 300 level courses are taught junior, senior and graduate students seeking a minor in mathematics. Petitioner held the teaching assistantship for the entire 1963-1964 academic year even though he did not actually teach during the spring quarter of 1964. As the money received each quarter was paid in three equal monthly installments, during the 1964 calendar year petitioner received a total of $1,000 from his teaching assistantship ($200 each for the months of January and February in the winter quarter, 1963-64; and $200 each for the months of March, April, and May in the spring quarter, 1964). Petitioner expected to render services to ISU at the time of his appointment as a teaching assistant. The only requirement that he was aware of for receiving the assistantship was graduate student status. No one on the staff of ISU advised petitioner that he had been awarded a scholarship or fellowship as a result of his appointment as a teaching assistant. An assistantship is not officially referred to as an "award" or a "grant." Petitioner took his preliminary *92 examinations for the Ph.D in June 1964. One question on the oral portion of these examinations was directly related to and, therefore, answered by the materials covered in one of the courses taught by petitioner. In addition, the poise that he gained through his teaching was helpful to him when he took the oral examinations. Otherwise, the substantive material covered by petitioner in the courses that he taught was only indirectly, if at all, useful to him in taking these examinations. Petitioner's primary purpose in attending ISU during 1964 was to work toward the Ph.D. degree. Petitioner received no credit toward his degree as a result of his teaching, since teaching was not required of all candidates for the degree sought by petitioner. However, ISU recognizes that some teaching experience is beneficial for all graduate students and, accordingly, recommends that graduate students gain some teaching experience during their graduate work, particularly if the student has the objective of becoming a teacher. Nevertheless, if a graduate student did not like teaching, or did not need the money, or desired employment in fields unrelated to teaching or his graduate studies, the fact *93 that he would not or did not teach would not prevent him from receiving the degree as long as he was otherwise academically qualified. Federal income taxes were withheld by ISU from the compensation received by petitioner as a graduate teaching assistant and ISU duly paid the social security taxes due the Federal Government as a result of the payments made to petitioner. ISU also made up "personnel action sheets" on petitioner. However, ISU maintains no such sheets for fellowship grantees nor does it withhold Federal income tax from the amounts received by fellowship grantees. During the spring quarter of the 1966-67 academic year (beginning in September 1966) there were approximately 2,500 graduate students at ISU. Of this total 934 held 1063 assistantships (of which about two-thirds were research assistantships) while 214 were on fellowships. Of the remaining graduate students all but about 300-400 received some form of financial assistance. While neither 1966 nor 1967 is in issue, these figures are not significantly different from the latter part of 1964, which year is in issue herein. It is expected by ISU's administration that all teaching assistants will render services *94 to the university; it would be improper for a student to hold such an assistantship and not render services therefor. The fact that some students may hold such an assistantship and not render services is probably the result of administrative error; the administrative officers would not knowingly approve such an arrangement. Not all teaching assistants are required to be in charge of teaching a particular course; many fulfill their obligation under the assistantship by simply assisting in the teaching function and in other ways performing services. The amounts received by graduate teaching assistants teaching part-time is no greater than the amounts regular staff instructors would receive for the same services. The source of funds used to pay graduate teaching assistants is from general university funds which are used to pay all professors and instructors; ISU does not have authority to grant fellowships from these funds and it does not do so. The principal source of revenue for ISU's general budget is derived from state appropriations and matriculation and course fees from students. ISU's administrative officers believe that an employer-employee relationship exists between each *95 graduate teaching assistant and the university as far as his teaching function is concerned. The teaching assistant, like a regular staff member, is subject to his department chairman when his performance is not adequate as a teacher. If, however, his academic performance is unsatisfactory, then his major professorship also has authority over him. A student-teacher relationship exists between each student and his major professor. If ISU did not employ teaching assistants, it would be necessary to hire other teachers or instructors to perform the teaching. Generally the department chairman of each department requests a specific number of teaching assistants for the ensuing academic year and his request is approved by the university if there is a demonstrated need for teaching services and if sufficient funds are available. Graduate students apply for assistantships on the same form and at the same time as they apply for admission. Not all students receive an assistantship since there are normally more applicants than positions available. Usually the ones with the best academic records are offered the assistantships and if these do not accept, offers are made to those with not as *96 good records. No one may hold an assistantship at ISU unless he is also enrolled as a graduate student. A graduate student is appointed as a teaching assistant only if there is a need for teaching to be done and if he appears qualified for the position. Graduate teaching assistants are permitted to request the courses they would like to teach. Although the graduate programs at ISU are also designed to prepare the students for careers in research, ISU recognizes no difference in status between a research assistantship and a teaching assistantship other than the fact that the latter is paid $10 per month more. Nor does the business office of ISU make any distinction in the treatment of the two types of assistantships for its purposes. Teaching assistants, unlike full-time professors and instructors, generally are not listed officially as members of the faculty staff. If a regular instructor is also taking courses toward a Ph.D., he may be officially both a member of the faculty staff as well as a graduate student, but he is not classified as a teaching assistant. As a staff member, even though he may also be taking courses, he is entitled to all prerogatives of that status that *97 teaching assistants are not entitled to. Some of the privileges not accorded to teaching assistants that instructors and other regular staff members are entitled to receive include: parking privileges, participation in retirement programs, use of certain university resources and facilities, and tenure. On the other hand, the tuition paid by teaching assistants is reduced below the amount paid by graduate students who are not also teaching or research assistants. Even though a teaching assistant is not officially a member of the faculty staff, he is nevertheless a part-time employee and as such comes under some but not all of the regulations and employment policies applicable to other employees. If he has been teaching for a while, he may be given a 1064 raise in recognition of his additional experience. He may be required by his department head to attend regular instructional staff meetings. As a graduate student, however, if he gets into difficulty he is subject to the disciplinary action of the dean of students. Teaching assistants, like research assistants, are required to maintain satisfactory progress in their work toward their degrees. If a teaching assistant's academic *98 work necessitates his placement on probation or is otherwise unsatisfactory, his assistantship would probably be terminated. One reason for this is that the student will then have more time to concentrate on his studies. If a student is relieved of the assistantship for academic reasons, the assistantship could terminate at the end of the current quarter, although normally it is continued through the academic year unless the student is doing very poorly. On the other hand, if a student were doing well academically but poorly in his teaching, his teaching assistantship might be terminated or at least replaced with a different type of assistantship. Petitioner excluded from his gross income in 1964 the $1,000 paid by ISU for services he rendered in the position of a teaching assistant in 1964. Respondent determined that such an amount was not excludable. Ultimate Findings of Fact The amounts paid to petitioner constituted compensation for services rendered. The primary purpose of the payments pursuant to the assistantship was to compensate petitioner. Petitioner did not hold a scholarship or fellowship grant during the taxable year. Opinion Petitioner herein contends that *99 the payments he received from ISU as a teaching assistant should be excluded from his income by virtue of section 117(a) which in pertinent part reads as follows: SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS. (a) General Rule. - In the case of an individual, gross income does not include - (1) any amount received - (A) as a scholarship at an educational institution (as defined in section 151(e) (4)), or (B) as a fellowship grant, * * * It is quite apparent upon an initial reading of this section that it shall not be applicable unless there is first a "scholarship" or "fellowship grant." Whereas generally it is a perfunctory determination whether or not certain payments represent either a scholarship or fellowship grant, a stumbling block is quite frequently encountered when the recipient of the payments is required to perform services for the payor. In such a case, we have often been faced, as we are here, with the question of whether the payments in question represented compensation on the one hand or a scholarship or fellowship grant on the other. Only in the latter case could the payments therefor be excludable. See Elmer L. Reese, Jr. 45 T.C. 407 (1966), *100 and Stephen L. Zolnay, 49 T.C. 389 (1968), and the cases cited therein. Thus, our initial inquiry should be into the question of whether or not the payments petitioner received herein constituted "compensation for services." Ethel M. Bonn [Dec. 24,138], 34 T.C. 64 (1960). However, a determination that the payments represented compensation for services would not, without more, mean that the payments petitioner received should be included in his gross income. To be included in income, the arrangement between the parties must be primarily one of employment and the payments, even though for study or research, must be primarily payments of compensation rather than for the primary purpose of enabling the recipient to carry on the studies or research in furtherance of his own education and training. [Emphasis added.] [Aileene Evans, 34 T.C. 720, 726-7 (1960).] Thus, if payments are made primarily to compensate the recipient, they do not represent a scholarship or fellowship grant. This "primary purpose" test has been applied in other decided cases wherein we have attempted to determine whether the payments in question constituted a scholarship *101 or fellowship. See Reese and Zolnay, both supra, and the cases cited therein. The Reese case and Ussery v. United States, 296 F. 2d 582 (C.A. 5, 1961), contain an exhaustive analysis of the historical and legislative background to section 117.[2] 1065 Since generally there is a dual or mutual purpose in these cases, the "primary purpose" problem in a particular case is usually difficult to resolve and is hence dependent upon the facts and circumstances of that case. See Zolnay, supra, at p. 395. In the case *102 at bar, however, we believe the record clearly shows both that (1) petitioner was compensated for services that he rendered to ISU and that (2) the primary purpose of the payments was to compensate petitioner. It is quire clear that petitioner taught courses and was paid therefor. The only apparent basis on which he could argue that he was not compensated for services is that he did not teach during the spring quarter of the taxable year. However, the record clearly shows that both petitioner and ISU expected that he would perform services. In addition, ISU does not generally permit a student to hold an assistantship without performing services. The fact that one performs no services or less than originally contemplated in no way changes the compensation characteristics of the payments that he receives therefor, absent the donative intent requisite for a gift. The intent of the parties, not the services actually performed, is controlling. Likewise, we believe that the record clearly shows that the primary purpose of the payments was to compensate petitioner. This conclusion is based primarily on the way the teaching assistantships were determined and assigned at ISU. The number *103 of teaching assistantships was not dependent upon the number of qualified nonfellowship students in need of financial assistance. Rather, the number was dependent upon the need for teachers and the availability of funds to pay teachers. If a graduate student were not available to teach a course, a "regular" staff member would be hired to teach it. If there were no teaching positions open, an otherwise qualified student would not receive a teaching assistantship; apparently no teaching positions would be added merely to accommodate a student in need of financial assistance. The only conclusion that we draw from this is that when ISU needed teachers, qualified graduate students were selected therefor when available. While it is true that payments for the teaching might enable the student to further his own education and training, it is equally clear that the primary purpose of such payments is to compensate the recipient. Any benefit to the recipient, whether in substantive knowledge, self-confidence, or economical [economy] (such as tuition reduction) appears to be strictly incidental. Other factors which we have used in our determination that the primary purpose of ISU's teaching *104 assistantships was to compensate petitioner include the fundamental fact that petitioner understood at the time of his appointment that he was to be paid for services rendered. In addition, the source of funds used to pay teaching assistants is from the general university budget which is used to pay all professors and instructors; ISU does not have authority to grant fellowships from these funds and it does not do so. Furthermore, the department chairman generally treats all teaching assistants in his department as employees and ISU believed that an employer-employee relationship exists between each teaching assistant and the University. [3] In this regard ISU withheld Federal income tax from their "salary" payments, while this was not done in distributing the funds administered by ISU to the fellowship recipients. [4] While it is true that a student-teacher relationship existed between each teaching assistant and his major professor with regard to the student's graduate studies and also in some respects with regard to his teaching, this in no way diminishes the predominant or primary relationship of employer-employee of ISU to each teaching assistant. An employer-employee relationship *105 and a student-teacher relationship, contrary to petitioner's contention, are not mutually exclusive. Petitioner also points to several differences in the privileges accorded regular staff members not generally accorded teaching assistants and vice versa. He concludes from this that the teaching assistants could not be employees. While it is true that these differences existed, this in no way precludes our finding that an employer-employee relationship existed between the teaching assistant and ISU. Any 1066 proposition that an organization may not have several categories of employees each with different privileges is without merit and does not warrant further discussion. In addition, petitioner stresses the fact that ISU administratively treated teaching assistants no different from the *106 manner it treated research assistants. Since, petitioner concludes, ISU research assistants can exclude payments under their assistantships by virtue of section 117, a fortiorari teaching assistants should also be permitted to exclude amounts they received under their assistantships. We find little merit in this reasoning. In the first place, we are aware of no case which holds that an ISU research assistant may take advantage of the general rule of section 117(a). Secondly, this case deals with a teaching assistant, not a research assistant; how we might treat an ISU research assistant for purposes of section 117 is irrelevant to the case at bar. Since the issue herein is factual, we confine our holding strictly to the facts of this case. Although both fellowships and assistantships at ISU provide financial assistance to its students, petitioner erroneously assumes that the primary purpose of both forms of financial assistance is to enable the recipients to further their own education and training. An ISU fellowship, which petitioner admits he did not hold during the taxable years, [5] is a form of financial assistance for "superior" students from whom no services are required. If *107 the primary purpose of both forms of financial assistance is to enable students to help pay for their graduate studies, why differentiate between fellowships and assistantships? Why should not ISU give every qualified student a fellowship? The answer to these questions lies in the inherent difference between an ISU fellowship and an ISU teaching assistantship: whereas the primary purpose of the former is to enable the recipient to further his own education and training, the primary purpose of the latter, we conclude, is to compensate the recipient. The payments petitioner received as a teaching assistant are, therefore, taxable as compensation for services rendered. To reflect the concessions of the parties, Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954.↩
2. Our application of the "primary purpose" test as it is used herein is inherent in the legislative and judicial history of the scholarship area and exists wholly independent from any such test in respondent's regulation section 1.117-4(c), the validity of which has been questioned. See Johnson v. Bingler, - F. 2d - (C.A. 3, June 5, 1968); 1 Mertens, Law of Federal Income Taxation, sec. 7.42, pp. 106-118; and 46 Taxes 485-493 (August 1968). Since we too have found this regulation somewhat cumbersome, we await the fulfillment of respondent's announced intention to revise his regulations under sec. 117↩. See Reese, supra, p. 416, footnote No. 6.
3. We recognize that even though ISU considers an employer-employee relationship to exist, this does not necessarily establish such a legal relationship. ↩
4. We also recognize that this factor, considered alone, is not determinative of an employer-employee relationship. See Chander P. Bhalla, 35 T.C. 13, 17-18 (1960); and Stephen L. Zolnay, supra, at p. 398↩.
5. Petitioner contends that he held a "scholarship" rather than a "fellowship." While we agree with his contention that we should not be bound by ISU's application of that term only to undergraduate grants, we feel the distinction is immaterial in this case.↩